MICHAEL W. STEBBINS, SBN 138326
STEPHEN S. WU, SBN 205091
MARC G. VAN NIEKERK, SBN 201329
**SILICON VALLEY LAW GROUP**
50 West San Fernando Street, Suite 750
San Jose, CA 95113
Telephone:  (408) 573-5700
Facsimile:  (408) 573-5701
Email:  mws@svlg.com; ssw@svlg.com; mvn@svlg.com

Attorneys for Plaintiff
EDC TECHNOLOGIES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.D.C. TECHNOLOGIES, INC., a California Corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>JIM SEIDEL, an individual, JASON PAVLOS, an individual, FRED KLINZMANN, an individual, SEIDEL ASSOCIATES, LLC, a California limited liability company, GREENBOX ENERGY, a business organization, form unknown, and DOES 1 through 20, inclusive,<br><br>　　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, VIOLATION OF THE STORED COMMUNICATIONS ACT, VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, BREACH OF CONTRACT, MISAPPROPRIATION OF TRADE SECRETS, BREACH OF DUTY OF LOYALTY, BREACH OF FIDUCIARY DUTY, UNFAIR COMPETITION, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, AND UNFAIR COMPETITON**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff E.D.C. Technologies, Inc. ("EDC," "the Company," or "Plaintiff") hereby alleges for its complaint ("Complaint") against Defendants Jim Seidel ("Seidel"), Jason Pavlos ("Pavlos"), Fred Klinzmann ("Klinzmann"), Seidel Associates, LLC ("Seidel Associates"), and GreenBox Energy ("GreenBox") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.      Defendant Jim Seidel, the former VP of Sales and Marketing of Plaintiff EDC, abused his trusted position in EDC to steal EDC's unique Internet-based hot water monitoring and control systems software and technology to start a competing business and take customers away from EDC.  Seidel lured Defendant Pavlos away from EDC to help him start Defendants Seidel Associates and GreenBox and compete against EDC.  Defendant Klinzmann aided the other Defendants to gain unauthorized access and/or exceed authorized access to EDC's computer systems.

2.      EDC brings this action to prevent the continuing and irreparable harm EDC is suffering and will continue to suffer due to Defendants' violation of the federal Computer Fraud and Abuse Act under 18 U.S.C. § 1030, violation of the Stored Communications Act under 18 U.S.C. §§ 2701, 2707, violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, breach of contract, misappropriation of trade secrets, breach of the duty of loyalty, breach of fiduciary duty, intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition.

## INTRADISTRICT ASSIGNMENT

3.      This case should be assigned to the San Francisco Division of this Court, because a substantial part of the events or omissions which give rise to the claim occurred in Sonoma County.  Local Rule 3-2(c), (d).

## THE PARTIES

4.      Plaintiff EDC is, and at all times mentioned herein was, a corporation in good standing, organized and existing under the laws of the State of California with its principal place of business located in Sebastopol, County of Sonoma, California.  Terry Pfaff ("Pfaff"),

founded EDC, a green energy company, in 1984, and is EDC's President. EDC partners with multi-family apartment owners, property management companies and natural gas utilities to achieve energy efficiency, conservation, monitoring and overall safety to residential and commercial domestic hot water and space heat systems.

5.      Defendant Seidel is, and at all times mentioned herein was, an individual residing, on information and belief, in Orange County, at 11 Palma Valley, Trabuco Canyon, California 92679. Seidel was employed by Plaintiff, but worked primarily from his residence in Orange County, from in or about April 2003 to on or about May 15, 2015.

6.      Defendant Pavlos is, and at all times mentioned herein was, an individual residing, on information and belief, in Sonoma County, at 715 Corlano Avenue, Santa Rosa, California 95404. Pavlos was employed by Plaintiff within Sonoma County from in or about January 2006 to on or about May 21, 2015.

7.      Defendant Klinzmann is, and at all times mentioned herein was, an individual residing, on information and belief, in Orange County, at 2503 Via Durazno, San Clemente, California 92673. Klinzmann performed certain services for Plaintiff within Orange County from in or about July 11, 2009 to on or about July 11, 2012.

8.      Defendant Seidel Associates is, and at all times mentioned herein was, a limited liability company in good standing, organized and existing under the laws of the State of California, and, on information and belief, with its principal place of business located at 2 Skylark Way, Trabuco Canyon, California 92679.

9.      Defendant GreenBox is, and at all times mentioned herein was, a business organization, form unknown, and, on information and belief, with its principal place of business located at 11 Palma Valley, Trabuco Canyon, California 92679. On information and belief, Seidel Associates is doing business as GreenBox.

10.     Plaintiff is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 20, and therefore sues them by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that said Does are in some way responsible for the damages and injuries to it as hereinafter set forth. Plaintiff will amend this Complaint to allege

1    the true names and capacities of Does 1 through 20 when ascertained.

2        11.    Plaintiff is informed and believes, and based thereon alleges, that Defendants

3    were, and at all times mentioned herein were, the agents, servants, employees, joint venturers,

4    alter egos, or co-conspirators of each of the other Defendants, and at all times herein mentioned

5    were acting within the course and scope of said agency, service, employment or relationship, or

6    in furtherance of the joint venture or conspiracy.

7                              **JURISDICTION AND VENUE**

8        12.    This action is a civil action of which this court has original jurisdiction under 28

9    U.S.C. § 1331 in that it arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and

10   the Stored Communications Act, 18 U.S.C. §§ 2701, 2707.  The Court has supplemental

11   jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

12       13.    Venue in this judicial district is appropriate under 28 U.S.C. § 1391(b)(1) because

13   all Defendants are residents of the State of California and at least one Defendant resides in

14   Sonoma County within the Northern District of California.

15                              **FACTUAL BACKGROUND**

16                    **EDC's Pioneering and Proprietary Technology**

17       14.    EDC provides a managed service by which owners and property management

18   companies managing large residential and commercial buildings can monitor and control their

19   hot water systems to maximize energy efficiency, conserve energy, and ultimately save

20   money.  EDC technology closely manages hot water system operation to maintain only that

21   amount of hot water at a set safe temperature that users in the building actually use.  By

22   maintaining the right amount of hot water at the right temperature to meet demand – no more

23   and no less – the owner or manager is able to deliver the exact amount of hot water needed

24   without wasting energy heating water that building users never use.

25       15.    During any given week, hot water demand rises and falls as people begin to use

26   water in the morning, use it during the day, and reduce consumption at night.  EDC's

27   technology causes a building's hot water system to create exactly enough hot water to match

28   actual consumption patterns for each half hour on a weekly cycle.  EDC's technology also

---

1   continuously fine-tunes a building's heating systems to maximize efficiency.

2       16.     EDC's system is different from the products offered by competitors, because it

3   provides hot water monitoring and control as an Internet-based managed service.  Other

4   companies provide unmanaged control hardware products that customers must maintain

5   themselves and develop their own software to analyze their data and control their hot water

6   systems.  Offering hot water management as a service gives customers greater control and

7   visibility into their energy usage without the complexity of developing and managing the

8   supporting infrastructure.

9       17.     By connecting hot water control hardware to an Internet-based monitoring and

10  control system for purposes of energy savings, EDC's hot water management system stands at

11  the intersection of two key technology trends:  first, the deployment of smart, connected

12  devices to the "Internet of Things" and, second, "clean technology" harnessing information

13  technology to increase energy efficiency.  The term "Internet of Things" refers to the

14  connection of physical equipment and devices to computer networks that traditionally had

15  been standalone devices.  The Internet of Things connects devices other than traditional

16  computers and mobile devices to public or private networks.  Examples include home

17  appliances, industrial equipment, medical and fitness devices, hospital equipment, motor

18  vehicles, and building heating/cooling systems.

19      18.     Customers can obtain remote access to the EDC system through EDC's

20  website to monitor various aspects of their hot water systems, view data about possible system

21  anomalies and performance irregularities, configure different parameters relating to hot water

22  system operations, and actively manage their hot water systems.  When anomalies or

23  irregularities occur, the system alerts the customer and EDC.  The EDC system maintains logs

24  to help determine what happened within the customer's hot water systems.  The alerts and

25  logs facilitate a timely and appropriate response to system problems.  The system can also

26  send alerts to a contractor working with the owner or manager, as well as the applicable utility

27  company.

28      19.     After its incorporation, EDC created its first hot water system.  That initial

system has evolved several times into a much more sophisticated system that meets the goal of delivering only as much hot water as needed for building owners and property managers. Advances over the decades include adding Internet-based accessibility, monitoring, and control. EDC's clients can view the status of their hot water systems and make adjustments using only a web browser and an online account accessible from EDC's website.

20.     The latest version of EDC's overall system for managing hot water ("EDC's Hot Water Management System") has four components: (1) a physical control device ("Controller") installed in a customer's building with sensors monitoring its hot water system and with cellular communications functionality to transmit and receive data; (2) server systems established and hosted by communications service providers that exchange data with the Controllers by cellular communications and EDC's server systems via the Internet; (3) EDC's back-end server infrastructure, which transmits and receives data from the communications service providers' servers using virtual private networks over the Internet and makes the data available to customers' and EDC's administrators via EDC's website; and (4) EDC's web-based user interface, which is accessible from administrators' client systems. Administrators can use any device or web browser that can log into an account on EDC's website and use EDC's web-based user interface. This architecture allows visibility to both EDC and customers' administrators to allow customers to make intelligent decisions with respect to the adjustment, operation, and repair of the hot water environment from any Internet-accessible location.

### EDC's Controller

21.     The first component of EDC's Hot Water Management System is the EDC Controller. One or more Controllers are installed on the hot water systems in each of its customers' large residential or commercial buildings. The fully programmable and autonomous Controller collects data from the sensors on the hot water system in the building and logs the data. The Controller also executes control instructions for the hot water system from the customer's or EDC's administrators. Finally, the Controller sends and receives data to the cellular communications service providers' servers via a cellular call. A cellular

1    module on the Controller handles cellular communications with communications service

2    providers' servers.  The cellular module itself is a small computer with hardware and

3    software.

4         22.    The Controller is a combination of EDC and third party technology.  EDC

5    designed the printed circuit board ("PCB") comprising the Controller as a whole.  EDC

6    determined the number and configuration of input/output ports, chips, and other components.

7    EDC developed the software ("Controller Software") stored in flash memory on a peripheral

8    interface controller chip ("PIC Chip"), which controls all functions of the Controller other

9    than cellular communications.  Finally, EDC developed the software that controls the cellular

10   module ("Cellular Module Software").  The hardware components of the Controller, including

11   the PIC Chip, the cellular module, and other chips are off-the-shelf components that were

12   designed and procured from third parties.

13        23.    EDC developed the Controller Software by itself.  EDC, however, developed

14   the Cellular Module Software with the assistance of ClearConnex, Inc., of Raleigh, North

15   Carolina ("ClearConnex"), a wireless device development firm.  EDC engaged ClearConnex,

16   pursuant to a Services Agreement, dated October 16, 2009, and a Mutual Non-Disclosure

17   Agreement ("MNDA") executed on August 3, 2009.

18        24.    Under the ClearConnex Services Agreement, EDC retains all right, title, and

19   interest in the portions of the Cellular Module Software developed by ClearConnex for EDC.

20   In addition, ClearConnex integrated certain preexisting code components into the Cellular

21   Module Software.  The Services Agreement gives EDC a non-exclusive license to use such

22   preexisting components.  Accordingly, EDC either owns or has a license to the all of the

23   portions of the Cellular Module Software developed by ClearConnex for EDC.

24        25.    At all relevant times, the source code and object code for the Controller

25   Software and Cellular Module Software have been kept confidential and remain proprietary to

26   EDC.  Under the Services Agreement and MNDA, ClearConnex has an obligation to maintain

27   the confidentiality of the the Controller Software and Cellular Module Software.

28   / / /

**Cellular Communication Infrastructure**

26.     The second component of EDC's Hot Water Management System is the cellular communication infrastructure.  This purpose of this infrastructure is to create a cellular communications channel between Controllers in different buildings and Internet-connected servers.

27.     By linking Controllers to the servers, this infrastructure creates a bridge between cellular networks and the Internet.  Communications service providers to EDC established and maintain this infrastructure.

**Internet-Hosted Server Infrastructure**

28.     The third component of EDC's Hot Water Management System is the Internet-based server infrastructure hosting EDC's server application.  A third party hosting company, Hosting.com, Inc., hosts the server infrastructure aggregating data from all communications service providers, including the hardware platform, storage systems, and server operating system software.  The servers at Hosting.com obtain data from the cellular communications service providers by a third party virtual private network system established with the assistance of the communications service providers.  EDC does not claim a proprietary interest in any of these components of the system, which are third party products and services.

29.     Nonetheless, EDC developed the server application software currently running on the Hosting.com servers (the "Server Software").  From around 1999 to 2005, EDC used an online database accessible over the Internet to control hot water systems.  Development of the current Server Software, however, took place starting in or about 2005 and the first production version was made available in or about late 2006.  Unlike previous systems, the current Server Software uses Microsoft SQL Server as a database management system.  Further refinement and improvement of the Server Software was occurring up until the time Seidel was terminated in May 2015.  Seidel managed the team of people developing the Server Software.  Three people wrote the source code for the Server Software:  Defendant Klinzmann, Sudhir Bharti ("Bharti"), and Devendra Panwar ("Panwar").  Bharti and Panwar were employees of Conexus Worldwide, Inc. ("Conexus").  Under a Consulting Agreement

dated September 2006 ("Conexus Agreement"), Conexus assigned all intellectual property rights in the Server Software to EDC.  Specifically, the Conexus Agreement states that the coding work materials created by Conexus shall be treated as works made for hire for EDC, and Conexus assigns to EDC all right, title, and interest that Conexus may have in such materials.  Thus, EDC owns all intellectual property rights to the Server Software.

30.     At all relevant times, the source code and object code for the Server Software have been kept confidential and remain proprietary to EDC.  The Conexus Agreement requires that Conexus maintain the confidentiality of certain "Confidential Information."  The Server Software code constitutes Confidential Information that Conexus must protect under the Conexus Agreement.

31.     The Server Software performs many functions, including but not limited to management and programming of the installed control systems, customer tracking and management, analysis and reporting of received control data sales tracking, work order generation and management and most other business operating functions. One of the key functions it performs is implementing what EDC refers to as the "Parsing Algorithm."  The Parsing Algorithm is an ordered series of hot water monitoring and control operations providing analysis for generating alarms, and generating alerts and notifications, which are a key feature of providing EDC's service offering.  This Parsing Algorithm uses inputs in the form of sensor data from a building's hot water system and produces output in the form of alarm notifications to not only EDC management personnel but also the customer or their contractor.  This information also allows EDC personnel to properly manage the hot water set points and provide instructions to cause the hot water system in the building to produce the minimal optimal amount of hot water and the minimal optimal temperature sufficient to meet the users' demand over a weekly time cycle.  EDC developed and updated the Parsing Algorithm based on decades of experience in optimizing hot water production in commercial and residential buildings.  EDC maintains and updates the Parsing Algorithm in spreadsheet form (the "Parsing Algorithm Spreadsheet"), which EDC has kept confidential and remains proprietary to EDC.  The current version of the Server Software implements in code the latest

version of the Parsing Algorithm.

## EDC's Console

32.    The fourth and final component of EDC's Hot Water Management System is the console interface ("Console").  EDC establishes individual password-protected user accounts on EDC's company website (www.savegas.com).  A customer or EDC administrator can log into his or her account using an ordinary web browser running on a computer or mobile device.  The Console provides the ability to view data from the user's Controllers, monitor the hot water systems in the buildings managed by the user, and send instructions to Controllers to manage the user's hot water systems.  EDC adminstrators can also use their version of the Console to view data, monitor systems, and send instructions to manage a customer's hot water systems.  The Console also performs data analysis and produces reports based on the data.

33.    As with the Server Software, Seidel managed the team of people developing the Console.  Development of the Console took place starting in or about 2005 and was generally available to customer in or about late 2006.  The Console was still being refined and approved when Seidel was terminated in May 2015.  Klinzmann, Bharti, and Panwar developed the web application code comprising the Console.  Bharti and Panwar worked on the Console through Conexus, by whom they were employed.  Under the Conexus Agreement, the coding work materials produced by Conexus are works made for hire for EDC and Conexus assigned all right, title, and interest Conexus may have in such materials.  Thus, EDC owns all intellectual property rights to the Console.

34.    At all relevant times, the source code and object code for the Console have been kept confidential and remain proprietary to EDC.  The Conexus Agreement requires that Conexus maintain the software it created in confidence, including the Console code.

## The Uniqueness of and Competitive Advantage from EDC's Hot Water Management System

35.    EDC's Hot Water Management System is different in a number of ways from the systems of its competitors generally available to building owners and managers.

36.     First, as mentioned above, EDC's Hot Water Management System is a managed service, rather than a piece of hardware a customer must integrate and operate itself. Unlike competitors that simply sell a hardware device, managing hot water as a service allows customers to monitor and control their hot water systems for energy savings and safety more easily without the complexity of creating and managing their own supporting infrastructure.

37.     Second, EDC's Hot Water Management System is unique in the industry, because it provides its customers with an ability to manage their hot water system via the Internet through EDC's Console.  A customer can access its Console account from anywhere in the world with Internet access using any device having a web browser, whether a desktop computer, laptop, tablet, phone, or other mobile device.

38.     Third, EDC's Hot Water Management System is an automation solution.  It allows owners, property managers, and the contractors helping them to monitor and remotely diagnose hot water system issues on a 24/7/365 basis.  EDC's Hot Water Management System acts like a virtual technician onsite in a building at all times providing valuable troubleshooting and efficiency information without the need to pay full-time employees to watch a building's hot water system.

39.     Fourth, EDC's Hot Water Management System is different from hardware devices generally available from competitors because of its data collection capabilities.  The Controller collects types and amounts of data from sensors and other sources not collected by competitors' products.  The frequency and time intervals of data collection are also unique.

40.     Fifth, EDC's data analysis capabilities make EDC's Hot Water Management System unique.  The Server Software embodies over 30 years of experience in methods and processes for managing hot water systems.  The Parsing Algorithm, formulas, and data analysis methods in the Server Software implement these methods and processes.

41.     Starting in 2005, EDC developed the software and infrastructure for EDC's current iteration of their Hot Water Management System.  EDC has spent in excess of $5 million in research and development since then to establish the technology and processes supporting EDC's Hot Water Management System.

42.     These aspects of EDC's Hot Water Management System provide EDC with an advantage over its competitors.  Accordingly, EDC derives actual economic value from the technology underlying EDC's Hot Water Management System not being generally known to the public or its competitors.

### Efforts to Maintain the Secrecy of EDC's Technology

43.     In order to ensure that EDC's proprietary and confidential information remains confidential, EDC requires its employees, vendors and contractors to sign confidentiality agreements.  EDC also employs passwords for access to its Console accounts and other computer systems, and heightened password protection for access to the Hosting.com accounts where the Server Software is hosted.

44.     EDC also enforces access control limitations so that a customer's Console account is accessible only to that customer and EDC support personnel.  One customer has no rights or ability to access the accounts of another customer.

45.     EDC also limits access privileges based on the information users have a need to know.  For example, customers' Console accounts have minimal access to interface with control operations of EDC's Hot Water Management System.  By contrast, EDC personnel managing systems remotely and acting as consultants to its customers have greater access rights to manage EDC's Hot Water Management System.

46.     In addition, EDC employees are provided with an Employee Handbook, which governs their relationship with EDC.  A true and correct copy of the Employee Handbook is attached hereto as **Exhibit A**.

47.     Under Section 5-1 of the Employee Handbook, it is a violation of the terms and conditions of employment for an employee to, *inter alia*, steal or remove EDC property and/or to disclose confidential business information.

48.     Section 5-3 sets forth the terms and conditions of an employee's use of EDC's electronic communications and computer systems.  Pursuant to this section, use of these facilities is limited to EDC business purposes and employees are advised that they should have no expectation of privacy with respect to use of the systems.

49.    Section 5-10 prohibits solicitation by an employee of another employee on working time.

50.    Section 5-12 prohibits, *inter alia*, wrongful copying, removal, use or disclosure of EDC confidential information to anyone outside of the company.

51.    Section 5-13 of the Employee Handbook prohibits, *inter alia*, any employee having, or appearing to have, any personal interests or relationships which actually or potentially conflict with the best interests of EDC.

52.    Section 5-14 prohibits unauthorized use of EDC's intellectual property, including print materials and software.

## The Start of the Parties' Relationship

53.    Seidel is Pfaff's nephew.  Until approximately 2002, Seidel most recently worked in sales and marketing at Electronic Data Systems ("EDS"), an information technology equipment and services company headquartered in Plano, Texas.  However, as early as 1998, Seidel expressed interest in EDC's technology and business model, and told his uncle of his interest in working with EDC.  The technology underlying EDC's Hot Water Management System has nothing whatsoever in common with any of the technology Seidel was exposed to before working for EDC.

54.    Because of his relationship with Pfaff, his sales and marketing experience, and his expressed desire to learn about EDC's technology and help grow its business, Pfaff hired Seidel as EDC's VP of Sales and Marketing in April 2003.  At that time, EDC only had approximately four (4) employees.  Although Pfaff repeatedly requested that Seidel execute a written confidentiality agreement with EDC, Seidel refused, explaining that his familial relationship with Pfaff, his duties as an EDC officer and employee, and his desire to someday have an ownership interest in EDC, made such formality unnecessary and redundant. Ultimately, Pfaff only allowed Seidel (and no one else) to remain employed without having executed such agreements because of the familial relationship and Seidel's repeated assurances that he acknowledged and agreed to the importance of keeping EDC's technology confidential.

**<u>Seidel's Critical Role in Developing EDC's Trade Secrets</u>**

55.    Seidel entrenched himself as the single person most knowledgeable about and most in control of EDC's technology development.  Specifically, Seidel arranged to be involved at a high level and undertook the following management responsibilities:

a.    Seidel had partial management responsibility for the team that developed the design of the Controller.

b.    Seidel had partial management oversight over the development of the Controller Software.

c.    Seidel managed some aspects of the relationship with ClearConnex and its development of Cellular Module Software.

d.    Seidel worked together with others at EDC to make arrangements with communications service providers to provide the cellular service infrastructure and supervised the team setting up the infrastructure.

e.    Seidel arranged with Hosting.com to manage the Internet-hosted server infrastructure and oversaw the team setting up the infrastructure.

f.    Seidel managed the relationship with Conexus and managed the Conexus and EDC personnel that write the Server Software.

g.    Seidel managed the development of the Console with Conexus and EDC personnel.

h.    In short, Seidel was involved at a very high level, with management and supervisory responsibility for the development and implementation of every component of EDC's Hot Water Management System.

56.    Because Seidel managed the development of every component of EDC's Hot Water Management System, he had access during his employment to all of EDC's technology, including:

a.    Design specifications and other documentation relating to the design of the Controller.

b.    The source and compiled code comprising the Controller Software.

c.    The source and compiled code comprising the Cellular Module Software.

d.    EDC accounts with cellular communications service providers, including user names and passwords.

e.    EDC's hosting account with Hosting.com, including EDC's account's user name and password.

f.    The source and compiled code comprising the Server Software.

g.    The source and compiled code comprising the Console web application.

57.    Between 2006 and his termination in May 2015, Seidel set out to make himself the single point of control for technology within EDC.  Seidel hoarded his duties and responsibilities and limited other EDC personnel's access to critical operational information.  Over time, Seidel's conduct gave him the ability to hold EDC hostage because no one else was as conversant in many of the critical processes he created for EDC, which he refused to document or explain.  Seidel effectively concealed the nature and extent of the software and technology being developed by his team from Pfaff and the rest of EDC until his termination.

58.    In or about 2006, EDC hired Pavlos as a lead operations technician.  Immediately prior to EDC, Pavlos had worked for Optical Coating Laboratories, Inc., a company whose technology had nothing in common with the technology underlying EDC's Hot Water Management System.

59.    Pursuant to his employment with EDC, Pavlos signed a Confidentiality Agreement ("Confidentiality Agreement") with EDC.  A true and correct copy of the Confidentiality Agreement is attached hereto as **Exhibit B**.  During his EDC employment, Pavlos was intimately involved with the development, refinement, and implementation of the technology supporting EDC's Hot Water Management System.  Pavlos's technical knowledge regarding the EDC Controller design was far greater than Seidel's.  Accordingly, while Seidel managed and oversaw software development, Pavlos performed the more detailed hands-on EDC Controller and infrastructure development processes.

60.    Pavlos was consulted to develop the code for the Controller Software, the Cellular Module Software, the Server Software, and the Console.  Pavlos was also the lead

1    technical person in installing Controllers at customer sites and had the most knowledge and

2    experience with those processes.

3        61.    On or about May 1, 2009, Seidel hired Klinzmann as an independent contractor

4    providing systems administration and project management services.  On or about August 1,

5    2009, Klinzmann signed a Non-Disclosure Agreement ("NDA") with EDC.  True and correct

6    copies of the Independent Contractor Agreement and NDA are attached hereto as **Exhibits C**

7    **and D**, respectively.

8        62.    Both Pavlos and Klinzmann worked closely with, and reported to, Seidel.

9        63.    On July 11, 2009, EDC hired Klinzmann as a full-time employee.  Klinzmann

10    provided assistance with coding the Server Software and Console.  He also provided various

11    kinds of technical support for Seidel and Pavlos.

12        64.    Upon information and belief, sometime in 2009, Klinzmann and Seidel

13    established a password-protected account with an Internet service using the Internet domain

14    oc-now.com and Klinzmann used the oc-now service as cloud-based storage to store EDC

15    data.  Klinzmann and Seidel created the oc-now.com account on behalf of EDC and in

16    connection with the performance of their duties as EDC employees.  Accordingly, the oc-

17    now.com account was an EDC asset.

18        65.    Upon information and belief, sometime in 2009, Klinzmann and Seidel

19    obtained a licensed copy of Microsoft SQL Software, which they intended to use to integrate

20    with the Server Software and placed an image file in the EDC oc-now.com account from a CD

21    or DVD, which could be used to install the SQL Software on a server.

22        66.    In or about 2010, and in recognition of his efforts on behalf of EDC, Pfaff

23    extended to Seidel an option to purchase 25% of EDC's shares, an option which Seidel

24    accepted but failed to exercise.

25        67.    Klinzmann remained an employee until EDC laid him off on July 11, 2012.  At

26    the time of his termination, EDC terminated Klinzmann's access to EDC's systems, and he

27    was no longer permitted to access any EDC systems.

28        68.    Upon Klinzmann's departure, however, he failed to disclose the existence of

the oc-now.com account to EDC and failed to give EDC the user name and password to the account.

69.    During his employment, Seidel used an EDC-issued laptop (the "Laptop") to conduct some of his business, although upon information and belief, Seidel also used personal devices to conduct EDC business and to conceal his activities from EDC.  The EDC-issued Laptop was capable of accessing the Internet.  At all times, the Laptop was and remained EDC property.  Seidel had access to his EDC email account as a user of EDC's web-based email system hosted at Rackspace and, upon information and belief, using email software that was running on one or more computers other than the Laptop.  Seidel was also administrator of the web-based email system for all of EDC.

<u>**Seidel's Growing Distraction and Deteriorating Performance**</u>

70.    From or about early 2014, it became apparent to Pfaff that Seidel was becoming dissatisfied with his employment at EDC and the company's direction and priorities.

71.    Pfaff had tasked Seidel with growing EDC's business and also overseeing the development of all aspects of EDC technology.  Seidel proved to be a good sales person, but a poor manager.  He refused several requests from Pfaff to delegate responsibilities.  The few people that Seidel hired did not last long as he refused to train them or to delegate duties to them. Seidel insisted on doing all sales pitches and presentations himself, limiting the growth of EDC. Seidel rebuffed suggestions that he train others to handle some of his sales responsibilities so that EDC could grow.

72.    At the same time, EDC's sales revenues, which were generally consistent from year to year, declined substantially.  Specifically, total sales generated by Seidel from May 2014 until May 2015 when he left EDC were less than $60,000.  By contrast, from 2006 until 2014, EDC averaged over $700,000 in new installation revenue per year for which Seidel was mostly responsible.

73.    During this time in early 2014, EDC attempted to establish and grow new business in Hawaii.  Pfaff put Seidel in charge of the sales and marketing initiative in Hawaii

at Seidel's request and insistence.  However, the results Seidel produced from marketing in Hawaii were disappointing.  During the fall of 2014, Seidel failed to close a single sale.  Seidel rebuffed inquiries from Pfaff and was increasingly reluctant to allow any access to EDC's high level systems operations, preserving his status as the single person with knowledge about marketing efforts in Hawaii.

74.  Communication with Seidel during 2014/2015 became few and far between with any EDC personnel other than Pavlos.  When asked about processes Seidel had responsibility for, his answers were abrupt and vague with little or no actual information being transferred.  Seidel resisted transferring knowledge and duties for sales or the Server Software, and he claimed there was no need for doing so.

75.  Seidel also claimed he was working overtime with sales and marketing in Hawaii and that EDC's Internet-hosted server infrastructure was working fine.  Yet, Seidel was not closing new EDC business in Hawaii at this time.  Seidel's explained in March 2015 that "little was happening and sales were very slow."

76.  EDC later discovered that during this time that, contrary to Seidel's claims of inactivity, Seidel spent a great deal of time working on Hawaii business, actively and frequently soliciting sales from EDC's existing and potential customers in order to divert business from EDC to his new business venture.

77.  Seidel also showed great resistance to working with internal procedures and processes relating to operations, including communication to other EDC employees, following processes he helped create, and producing and adhering to budgets and sales forecasting within his areas of responsibility, which were critical to EDC operations and banking relationships.

78.  Upon information and belief, Seidel took steps to start up his competing business in 2014 while still employed at EDC.  According to the California Secretary of State's records, Defendant Seidel Associates, LLC was organized as a California limited liability company on October 1, 2014.

79.  In essence, during the last few years of Seidel's employment, Seidel was

holding EDC hostage by his control of sales relationships and the resulting installation income, his control of the technology development for EDC's Hot Water Management System, and his reluctance to delegate those responsibilities to others.

80.     On or about May 12, 2015, Pfaff met with Seidel to discuss Seidel's performance and advised him that unless Seidel put more emphasis on EDC's success instead of his own, he would be terminated.  During that discussion, Seidel hinted to Pfaff that he was in the process of establishing a competing business in Hawaii.  In an effort to prevent adverse effects that would result from a hostile parting of the ways, Pfaff suggested that EDC might consider a distributorship agreement with Seidel for Hawaii.

### EDC Discovers Seidel's, Pavlov's and Klinzmann's Breach of Duty of Loyalty and Other Wrongful Acts after Seidel's Departure

81.     On or about May 15, 2015, Seidel rejected Pfaff's proposal for a distributorship in Hawaii.  Pfaff, believing that Seidel was engaging in misconduct, terminated his employment with EDC.  Upon information and belief, around this time, Seidel deleted all of his emails on the EDC web-hosted email system and on the EDC-issued Laptop. Immediately after Seidel left EDC, Seidel failed to return the EDC-issued Laptop.  EDC began turning off all access Seidel had to EDC systems.  Nonetheless, during this time period, EDC could not stop Seidel from using the EDC-issued Laptop.  Upon information and belief, Seidel continued to access the Laptop and delete emails after his departure from EDC without EDC's authorization.

82.     In addition, EDC was unable to access its accounts with Hosting.com, the access to which Seidel had limited to himself as administrator.  Seidel refused to divulge the password for EDC's Hosting.com account and attempted to hold EDC hostage by insisting on the payment of severance as a condition of disclosing the password.

83.     Given the nature of Seidel's departure from the Company, it began an internal review and investigation.  The investigation revealed, among other things, the following, which EDC alleges upon information and belief:

a.      For at least six (6) months prior to Seidel's departure, while employed

by EDC, Seidel and Pavlos had been developing a hot water management service offering by using EDC's technology, when they should have been working for EDC, and EDC's resources.

b.      Specifically, Seidel and Pavlos stole information about EDC's hardware and software; they assembled and organized that information in the form of hardware and software specifications; and they submitted these specifications to an Internet of Things development company called NimbeLink Corp. located in Plymouth, Minnesota ("NimbeLink") for the purpose of obtaining NimbeLink's assistance in completing hardware and software for a managed service to compete with EDC's Hot Water Management System.

c.      Seidel attempted to solicit other EDC employees to leave EDC and form a company to compete against it and divert its customers.

d.      Seidel requested copies of EDC confidential information from Sudhir Bharti, including a copy of the latest version of the Parsing Algorithm Spreadsheet.  Upon information and belief, Seidel had a copy of the Parsing Algorithm Spreadsheet as it existed at the time of his termination.

e.      In February 2015, Seidel, on behalf of himself, Seidel Associates, and GreenBox, approached Klinzmann, who had long since left EDC and had no right to access EDC's networks or accounts.  Seidel asked for Klinzmann's help to obtain a copy of EDC's image file for Microsoft SQL Server software (the "Image File").  He may have wanted to pirate a copy of SQL Server to assist the development of Defendants' competing server software without having to pay for a new license.

f.      Klinzmann cooperated with Seidel and acted as agent of Defendants Seidel, Seidel Associates, and GreenBox.  As an agent of Seidel, Klinzmann wrongfully accessed EDC's oc-now.com account without EDC's permission for the purpose of configuring it in order to permit Seidel to download the Image File.  As part of the configuration process, Klinzmann transmitted and received information from the server hosting oc-now.com.

g.      On February 27, 2015, Klinzmann gave Seidel instructions on how to

download the Image File from the EDC oc-now.com account using the File Transfer Protocol ("FTP"), Klinzmann gave Seidel a user name and password to the EDC account. Seidel replied that he was unsuccessful in downloading the Image File using FTP. Klinzmann then told Seidel in a reply email that if the problem continued, Klinzmann could upload the Image File to a different server. Accordingly, Klinzmann asked Seidel for the user name and password to another server. Seidel then replied to Klinzmann with an email containing the domain of an EDC savegas.com server. Finally, Seidel included in that email a user name to access the server and a confidential password corresponding to that user name.

h.    Seidel transferred the password to Klinzmann for the purpose of Klinzmann gaining access to the EDC savegas.com server knowing that he did not have authorization from EDC to allow Klinzmann to access that server.

i.    Seidel transferred the password to Klinzmann to further his wrongful scheme for pirating a copy of Microsoft SQL Server, starting a business in competition with EDC, and diverting clients from EDC.

j.    Klinzmann accessed the EDC savegas.com server for the purpose of uploading a copy of the Image File to it.

k.    Seidel and Pavlos began meeting with important EDC customers in various states to demonstrate their competitive offering and company, to be known as GreenBox, although they actually used EDC's own products in order to demonstrate the competitive offering's features.

84.    When EDC discovered Pavlos' role in the aforementioned wrongful acts, it terminated his employment on May 21, 2015.

85.    On or about May 20, 2015, counsel for EDC sent a cease and desist letter to Seidel. A true and correct copy of the May 20, 2015 letter is attached hereto as **Exhibit E**.

86.    Counsel for Seidel responded to the letter denying any wrongful conduct by Seidel and threatening counterclaims against EDC, but ultimately agreeing to return the EDC-issued Laptop still in Seidel's possession, and to provide passwords to enable EDC to access its various accounts and systems, which Seidel had wrongfully withheld. Counsel for Seidel also

1  suggested that the parties meet to address any "misunderstandings."

2       87.    Pfaff regained access as an administrator of the Rackspace account. Pfaff also

3  discovered that Seidel's EDC email account was empty. He then worked with Rackspace to

4  recover copies of the emails Seidel deleted.

5       88.    On information and belief, Pavlos is employed by or contracted to Seidel in a

6  competitive business operating as GreenBox, which is using the technology from EDC's Hot

7  Water Management System. GreenBox has distributed marketing materials and published at

8  least one online video marketing products and services virtually identical to those of EDC.

9  Seidel and, on information and belief, Pavlos, have also been contacting EDC contractors who

10  work with EDC installing its Controllers.

11       89.    Remarkably, after being fired from EDC, Seidel, and then GreenBox, quickly

12  began offering and installing a competing hot water management managed service. What took

13  years for EDC to develop, GreenBox was able to deploy in a matter of months. It would not

14  have been possible for Seidel to independently develop his competing offering in the time that

15  elapsed between his departure from EDC on May 15, 2015, and his launching of a new business

16  at or about the same time.

17       90.    GreenBox has solicited numerous EDC customers to supplant EDC as their

18  service provider. In many instances, he was successful in diverting customers from EDC,

19  irreparably harming EDC.

20       91.    Upon information and belief, when attempting to solicit EDC customers,

21  Defendants falsely stated that:

22            a.    Pavlos was the only trained technician that EDC had employed and that he

23  no longer worked there but instead had joined GreenBox, and

24            b.    Defendants provide a service with hardware that is superior to EDC's.

25       92.    Upon information and belief, Defendants made these statements in order to induce

26  EDC customers to terminate their contracts with EDC and enter into service agreements with

27  GreenBox.

28       93.    In order to investigate Seidel's and Pavlos's misconduct, counsel for EDC

1  retained forensic investigators to collect and analyze evidence. In addition, EDC retained

2  information security consultants who reviewed EDC's security controls in light of Defendants'

3  exploits and provided advice on closing the vulnerabilities exposed by their conduct. The fees

4  EDC has paid to these experts to recover the data and investigate Defendants' wrongdoing have

5  been, within the past year, in excess of $5,000.

6      94.    EDC has also spent vast amounts of time and money following Seidel's and

7  Pavlos's departures to analyze the software Seidel and his teams wrote in order to understand the

8  status of the software and to update and maintain it going forward.

9

10  ## FIRST CAUSE OF ACTION

11  **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

12  **(Against Seidel, Klinzmann, Seidel Associates, and GreenBox)**

13      95.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations

14  in each of the other paragraphs of this Complaint.

15      96.    The EDC-issued Laptop, the Rackspace servers hosting EDC's web-based email

16  system, the server hosting oc-now.com, and the server hosting savegas.com were at all relevant

17  times computers that accessed the Internet, are used in interstate commerce, and are therefore

18  "protected computers" under the Computer Fraud and Abuse Act ("CFAA"), as that term is

19  defined in 18 U.S.C. § 1030(e)(2). EDC's Microsoft SQL Server Image File resided in EDC's

20  oc-now.com account.

21      97.    Upon information and belief, until Seidel returned the EDC-issued Laptop to

22  EDC:

23          a.    Seidel intentionally accessed the Laptop after his termination from EDC

24  and after his authorization from EDC to access the Laptop had ended;

25          b.    Seidel's access to the Laptop after his termination enabled Seidel to

26  continue stealing EDC's valuable proprietary information;

27          c.    Because Seidel intentionally accessed the Laptop without authorization

28  and thereby obtained information from it after his termination from EDC, he violated 18 U.S.C.

1    § 1030(a)(2)(C); and

2           d.    Seidel knowingly and with intent to defraud, accessed the Laptop without

3    authorization after his termination, and by means of such conduct furthered his intended fraud

4    and obtained EDC's valuable proprietary information in violation of 18 U.S.C. § 1030(a)(4)**.**

5    98.    Through their actions in violating the CFAA, Defendants have caused Plaintiffs to

6    suffer "loss" within the meaning of 18 U.S.C. § 1030(e)(11) for responding to, investigating, and

7    remedying the problems caused by Defendants' conduct and for conducting a computer forensic

8    examination of the computer systems they accessed.  Such losses exceed $5,000 in the one-year

9    period before the filing of this Complaint.  Therefore, Defendants' conduct involves causing

10   "loss" to EDC during a one-year period aggregating at least $5,000 in value within the meaning

11   of 18 U.S.C. § 1030(c)(4)(A)(i)(I).

12   99.    Upon information and belief, sometime after his termination from EDC, Seidel

13   deleted numerous emails from EDC's email system by accessing the system and transmitting a

14   command to the web-based interface.  The command caused all of Seidel's emails to be deleted

15   from EDC's email server.  He thereby impaired the availability of these emails to EDC's

16   business.  Accordingly, Seidel knowingly caused the transmission of a delete command to the

17   EDC email system, and as a result of such conduct, intentionally caused damage without

18   authorization, to EDC's email server, which are both protected computers under the CFAA, in

19   violation of 18 U.S.C. § 1030(a)(5)(A).  Moreover, when Seidel deleted these emails, he

20   intentionally accesses a protected computer without authorization, and as a result of such

21   conduct, recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).  Furthermore, by

22   deleting these emails, Seidel intentionally accessed a protected computer without authorization,

23   and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C.

24   § 1030(a)(5)(C).

25   100.    When Seidel transferred the password to Klinzmann on or about February 27,

26   2015 to allow Klinzmann to access the EDC savegas.com server through the Internet, an

27   instrumentality of interstate commerce, for purposes of gaining access to the server without

28   EDC's authorization, Seidel knowingly and with intent to defraud, trafficked in a password

1   where such trafficking affects interstate commerce, in violation of 18 U.S.C. § 1030(a)(6)(A).

2       101.    Defendant Klinzmann intentionally accessed the password-protected EDC

3   account on the oc-now.com server without EDC's authorization and obtained information from

4   that server, including without limitation the Image File, in violation of 18 U.S.C.

5   § 1030(a)(2)(C).

6       102.    Klinzmann knowingly and with intent to defraud, accessed the password-

7   protected EDC account on the oc-now.com server without EDC's authorization, and by means of

8   such conduct furthers Defendants' intended fraud and obtain the Image File, which is something

9   of value, in violation of in violation of 18 U.S.C. § 1030(a)(4).

10      103.    Klinzmann intentionally accessed the password-protected EDC server at

11  savegas.com using a user name and password belonging to EDC and supplied by Seidel and

12  obtained information from that server in connection with uploading the Image File to server, in

13  violation of in violation of 18 U.S.C. § 1030(a)(2)(B).

14      104.    Seidel and Klinzmann conspired together to commit the violations discussed

15  above, in violation of 18 U.S.C. § 1030(b).  As co-conspirators, Seidel is liable for the violations

16  of Klinzmann, and Klinzmann is liable for the violations of Seidel.

17      105.    At all relevant times, Seidel was acting as an agent for Seidel Associates and

18  GreenBox.  Accordingly, Defendants Seidel Associates and GreenBox are liable for Seidel's

19  violations of the CFAA described above.

20      106.    Klinzmann violated the CFAA in his capacity as agent for Defendants Seidel,

21  Seidel Associates, and GreenBox.  Accordingly, Seidel, Seidel Associates, and GreenBox are

22  liable for Klinzmann's violations of the CFAA described above.

23      107.    As a result of Defendants' violations of the CFAA, EDC has sustained and will

24  continue to sustain damages in an amount to be proven at trial.

25      108.    As a result of Seidel's deletion of emails from EDC's email system and the

26  expenses incurred by EDC in responding to, investigating, and remedying the problems caused

27  by Defendants' conduct and conducting a computer forensic examination of the computer

28  systems they accessed, EDC has suffered damage and loss.

109.    EDC is entitled to an award of compensatory damages in an amount to be determined at trial and injunctive relief restraining Defendants and their agents from violating the CFAA.

WHEREFORE, EDC prays for relief as set forth below.

**SECOND CAUSE OF ACTION**

**(Violation of the Stored Communications Act, 18 U.S.C. §§ 2701, 2707)**

**(Against Seidel)**

110.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

111.    Plaintiff EDC maintains an email system through an email server that allows authorized EDC users to send and receive emails through the Internet.  Emails sent and received by users go through EDC's email server hosted by Rackspace, which EDC retained to provide hosting services.

112.    EDC is a "provider" of a "facility" for users to use "electronic communications services" within the meaning of 18 U.S.C. §§ 2701(a), 2707(a).

113.    The emails on EDC's email server serve as a backup for the emails in the client software on the individual computers of users and therefore are in "electronic storage" within the meaning of 18 U.S.C. § 2510(17)(B).  Upon information and belief, the EDC emails in Seidel's account hosted by Rackspace were duplicates of emails that Seidel stored and accessed using an email client on a computer other than the Laptop.

114.    Upon information and belief, in a course of conduct that continued following his termination from EDC, Defendant Seidel accessed and deleted all of his EDC emails.

115.    Defendant Seidel intentionally accessed without authorization a facility through which an electronic communication service is provided and thereby obtained access to the electronic communications while they were in electronic storage EDC's email system, in violation of 18 U.S.C. § 2701(a)(1).

116.    By deleting the emails on his email client and EDC's email server, Defendant

Seidel prevented EDC from accessing them. Accordingly, Defendant Seidel intentionally accessed without authorization a facility through which an electronic communication service is provided and thereby altered access to the electronic communications and prevented EDC's access to them, while they were in electronic storage EDC's email system, in violation of 18 U.S.C. § 2701(a)(1).

117. Defendant Seidel accessed his email intentionally and acted with malice, fraud, oppression, and in conscious disregard of EDC's rights.

118. As a result of Defendants' violations of the Stored Communications Act, EDC has sustained and will continue to sustain damages in an amount to be proven at trial.

119. Also as a result of Seidel's deletion of emails from EDC's email system and the expenses incurred by EDC in responding to, investigating, and remedying the problems caused by Seidel's conduct and conducting a computer forensic examination of the computer systems he accessed, EDC suffered damage and loss by reason of Defendants' violations of the Stored Communications Act.

120. EDC is accordingly entitled to an award of compensatory damages in an amount to be determined at trial, a disgorgement of any profits Defendants accrued as a result of their violations of the Stored Communications Act, minimum statutory damages of $1,000 per violation, punitive damages, injunctive relief restraining Defendants and their agents from violating the Stored Communications Act, and an award of attorneys' fees pursuant to 18 U.S.C. § 2707(b), (c).

WHEREFORE, EDC prays for relief as set forth below.

### THIRD CAUSE OF ACTION

**(Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502)**

**(Against Seidel, Klinzmann, Seidel Associates, and GreenBox)**

121. Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

122.   The EDC-issued Laptop, EDC's email server, the server hosting oc-now.com, and the server hosting savegas.com were at all relevant times "computers" and "computer systems" within the meaning of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CCCDAFA").  EDC owns the Laptop and the savegas.com server.  EDC was a lessee of the oc-now.com account and the Rackspace server(s) hosting EDC's webmail facility.

123.   EDC owns an email system that was at all relevant times a "computer network" within the meaning of CCCDAFA.

124.   Upon information and belief, until Seidel returned the EDC-issued Laptop to EDC:

a.   Seidel knowingly accessed the Laptop after his termination from EDC and after his authorization from EDC to access the Laptop had ended;

b.   Seidel's access to the Laptop after his termination enabled Seidel to continue stealing EDC's valuable proprietary information;

c.   Seidel used EDC's valuable proprietary information to start GreenBox and compete against EDC;

d.   Therefore, Seidel knowingly accessed, and without EDC's permission, used data, EDC's computer/computer system in order to wrongfully control and obtain data in violation of Cal. Penal Code § 502(c)(1), (c)(7).

e.   Moreover, Seidel knowingly accessed, and without EDC's permission, made use of data from EDC's computer/computer system, and took copies from it, in violation of Cal. Penal Code § 502(c)(2).

125.   Through their actions in violating the CCCDAFA, Defendants have caused Plaintiffs to suffer "loss" within the meaning of Cal. Penal Code § 502(e)(1) for responding to, investigating, and remedying the problems caused by Defendants' conduct and for conducting a computer forensic examination of the computer systems they accessed.

126.   Upon information and belief, sometime around the time of his termination from EDC and continuing thereafter, Seidel deleted numerous emails from EDC's email server.  The

1    emails had been internal to the Laptop and EDC's email system.  Thus, Seidel knowingly

2    accessed, and without EDC's permission, damaged, deleted, and destroyed data residing internal

3    to a computer, computer system and computer network in violation of Cal. Penal Code

4    § 502(c)(4).

5        127.    When Seidel transferred the password to Klinzmann on or about February 27,

6    2015 to allow Klinzmann to access the EDC savegas.com server through the Internet for

7    purposes of gaining access to the server without EDC's authorization, Seidel knowingly and

8    without EDC's permission provided Klinzmann a means of accessing a computer/computer

9    system for purposes of allowing Klinzmann to access the savegas.com server, copy the Image

10   File from oc-now.com server, and transfer the copy to Seidel's control for later use in violation

11   of  Cal. Penal Code § 502(c)(1), (c)(2), (c)(7).  Seidel's providing the password therefore

12   constitutes a violation of Cal. Penal Code § 502(c)(6).

13       128.    Defendant Klinzmann knowingly and without EDC's permission accessed the

14   password-protected EDC account on the oc-now.com server without EDC's authorization and

15   copied and used data from that server, including without limitation the Image File, in violation of

16   Cal. Penal Code § 502(c)(1), (c)(2), (c)(7).

17       129.    At all relevant times, Defendant Seidel was acting as an agent for Seidel

18   Associates and GreenBox.  Accordingly, Defendants Seidel Associates and GreenBox are

19   vicariously liable for Seidel's violations of the CCCDAFA described above.

20       130.    Defendant Klinzmann violated the CCCDAFA in his capacity as agent for

21   Defendants Seidel, Seidel Associates, and GreenBox.  Accordingly, Defendants Seidel, Seidel

22   Associates, and GreenBox are vicariously liable for Klinzmann's violations of the CCCDAFA

23   described above.

24       131.    As a result of Defendants' violations of the CCCDAFA, EDC has sustained and

25   will continue to sustain damages in an amount to be proven at trial.

26       132.    Among other things, as a result of Seidel's deletion of emails from EDC's email

27   system and the expenses incurred by EDC in responding to, investigating, and remedying the

28   problems caused by Defendants' conduct and conducting a computer forensic examination of the

computer systems they accessed, EDC suffered damage and loss by reason of Defendants' violations of the CCCDAFA.

133.    Accordingly, EDC is entitled to an award of compensatory damages in an amount to be determined at trial, injunctive relief restraining Defendants and their agents from violating the CCCDAFA, and an award of attorneys' fees pursuant to Cal. Penal Code § 502(e)(2).

WHEREFORE, EDC prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)

### (Against Seidel)

134.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

135.    At all times material hereto, EDC had in place a written Employee Handbook which set forth terms and conditions governing employment of all employees.  (**Exhibit A**.)

136.    Upon accepting employment, Seidel expressly, or alternatively impliedly, agreed to be subject to the terms and conditions of the Employee Handbook.

137.    Pursuant to Section 5-1 of the Employee Handbook, it is a violation of the terms and conditions of employment for an employee to, *inter alia*, steal or remove EDC property and/or to disclose confidential business information.

138.    Section 5-3 sets forth the terms and conditions of an employee's use of EDC's electronic communications and computer systems.  Pursuant to this section, use of these facilities is limited to EDC business purposes and employees are advised that they should have no expectation of privacy with respect to use of the systems.

139.    Section 5-10 prohibits solicitation by an employee of another employee on working time.

140.    Section 5-12 prohibits, *inter alia*, wrongful copying, removal, use or disclosure of EDC confidential information to anyone outside of the company.

141.    Section 5-13 of the Employee Handbook prohibits, *inter alia*, any employee

having, or appearing to have, any personal interests or relationships which actually or potentially conflict with the best interests of EDC.

142.    Section 5-14 prohibits unauthorized use of EDC's intellectual property, including print materials and software.

143.    In breach of the agreement, among other things, Seidel has:

(a)    Removed property belonging to EDC from EDC's possession;

(b)    Used EDC communications systems and computers to develop and set up a business in competition with EDC;

(c)    Solicited EDC employees to join him in a competing business while employed by EDC;

(d)    Used and copied EDC's intellectual property and confidential information, the EDC Proprietary Information, to develop and set up a business in competition with EDC;

(e)    Used EDC Proprietary Information to solicit business from EDC customers and potential customers in competition with EDC.

144.    EDC has performed all of its obligations under the agreement except those obligations that have been prevented or excused by Seidel's breach.

145.    As a result of Seidel's breaches of the agreement, EDC has sustained and will continue to sustain damages in an amount to be proven at trial.

WHEREFORE, EDC prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Breach of Contract)

### (Against Pavlos)

146.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

147.    On or about April 11, 2014, Pavlos executed a written agreement Confidentiality Agreement with EDC.  (**Exhibit B**.)

148.    Pursuant to the Confidentiality Agreement, Pavlos agreed, *inter alia*, not to use any Confidential Information for any purpose other than the "Permitted Purpose" of the agreement.  (*Id.*¸ ¶¶1-5.)

149.    Pavlos also agreed not to solely nor jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of EDC.  (*Id.*, 6-8.)

150.    Pursuant to paragraph 8 of the Confidentiality Agreement, Pavlos agreed not to solicit, or attempt to solicit, any EDC employee to leave EDC's employment.  Pursuant to paragraph 9 of the Confidentiality Agreement, Pavlos agreed while employed by EDC, not to be directly or indirectly involved with any competitor of EDC, or attempt to solicit or divert any business from any customer of EDC.

151.    In breach of the Confidentiality Agreement, among other things, Pavlos has:

    (a)    Removed property belonging to EDC from EDC's possession;

    (b)    Undertaken actions to develop and set up a business in competition with EDC while employed by EDC;

    (c)    Solicited EDC employees to join him in a competing business while employed by EDC;

    (d)    Used and copied EDC's intellectual property and confidential information to develop and set up a business in competition with EDC;

    (e)    Used EDC's intellectual property and confidential information to solicit business in competition with EDC.

152.    EDC has performed all of its obligations under the agreements except those obligations that have been prevented or excused by Pavlos' breach.

153.    As a result of Pavlos' breaches of the agreement, EDC has sustained and will continue to sustain damages in an amount to be proven at trial.

WHEREFORE, EDC prays for relief as set forth below.

/ / /

/ / /

## SIXTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets, Cal. Civil Code § 3426 et seq.)

### (Against All Defendants)

154.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

155.    Over the course of many years, EDC has developed hardware, software, algorithms, business methods, a web interface, marketing materials and customer lists enabling it to provide a unique service in the marketplace (the "EDC Proprietary Information".)

156.    The EDC Proprietary Information includes trade secrets as defined by the California Uniform Trade Secrets Act, California Civil Code Section 3426 *et seq.* (the "CUTSA").  The following items of the EDC Proprietary Information constitute trade secrets under the CUTSA:

        a.      The design of the hardware Controller;

        b.      The Controller Software;

        c.      The Cellular Module Software;

        d.      The Server Software;

        e.      The Parsing Algorithm;

        f.      The Parsing Algorithm Spreadsheet;

        g.      The Console Software;

        h.      Documentation of the design and specifications for the items set forth in subsections (a) through (g) above; and

        i.      Passwords to EDC's accounts to computer systems.

157.    EDC has taken reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, and this information derives economic value from not being generally known.

158.    Defendants' have acquired EDC's trade secret information by improper means, including, without limitation, conversion and outright theft.  Such acts constitute misappropriation under the CUTSA.

1    159.    Defendants have misappropriated EDC's trade secret information without EDC's express or implied consent, authorization or authority.

160.    Defendants' conduct has caused, and will continue to cause, irreparable harm to EDC. Unless and until enjoined, Defendants will continue to receive the benefit of the trade secrets misappropriated from EDC. Moreover, Defendants will disclose EDC's trade secrets to third parties. EDC will forever lose the value of its investment in its trade secrets. EDC's competitive position, based upon its valuable knowledge, access to and use of its trade secrets, will be irretrievably lost.

161.    As a proximate cause of the actual and threatened misappropriation of EDC's trade secrets, EDC will suffer the loss of revenues from sale of its products and services, and from an inability to compete in the market place, all in an amount to be proven at trial.

162.    Defendants acted knowingly, willfully, recklessly or maliciously with the intent to injure Plaintiff and in conscious disregard of the injury which would be done to Plaintiff by such conduct such that an award of punitive and exemplary damages is warranted in an amount to be determined at trial. EDC is therefore entitled to exemplary damages and attorneys' fees in an amount to be proven at trial under the provisions of Civil Code Sections 3426.3 and 3426.4.

WHEREFORE, EDC prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Breach of Duty of Loyalty)

### (Against Seidel and Pavlos)

163.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

164.    At all relevant times, Seidel and Pavlos were employees of, and owed a duty of loyalty to, EDC.

165.    In breach of their duties to EDC, Seidel and Pavlos developed a business to compete with EDC while employed by EDC.

166.    The actions of the Seidel and Pavlos were inimical to the best interests of

EDC.

167.    Seidel and Pavlos conspired with each other to breach their duties to EDC.

168.    Seidel and Pavlos aided and abetted each other's breaches of their duties to EDC.

169.    As a result of Defendants' breaches of their duties to EDC, EDC has sustained and will continue to sustain damages in an amount to be proven at trial.

WHEREFORE, EDC prays for relief as set forth below.


## EIGHTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against Seidel)

170.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

171.    At all relevant times, Seidel had duties and performed functions equivalent to those of an officer of EDC, participated in the management of the company, exercised some discretionary authority, and owed a fiduciary duty to EDC.

172.    In breach of his fiduciary duties to EDC, Seidel planned and developed a business to compete with EDC while employed by EDC.

173.    The actions of the Seidel was inimical to the best interests of EDC.

174.    As a result of Seidel's breaches of his duties to EDC, EDC has sustained and will continue to sustain damages in an amount to be proven at trial.

175.    Seidel acted knowingly, willfully, recklessly or maliciously with the intent to injure Plaintiff and in conscious disregard of the injury which would be done to Plaintiff by such conduct such that an award of punitive and exemplary damages is warranted in an amount to be determined at trial.

WHEREFORE, EDC prays for relief as set forth below.

/ / /

/ / /

/ / /

**NINTH CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations)**

**(Against All Defendants)**

176.    Plaintiff EDC realleges and incorporates in this paragraph each of the allegations in each of the other paragraphs of this Complaint.

177.    On information and belief, Defendants have made false statements to various third parties, who have contractual relations with EDC in order to induce such third parties not to perform their contractual obligations to EDC.

178.    Defendants' intentional conduct has caused actual disruption of contractual relationships between EDC and third parties, and Defendants have thereby committed the tort of intentional interference with contractual relations.

179.    As a result of Defendants' wrongful acts as alleged above, EDC has sustained and will continue to sustain, damages in an amount to be proven at trial.

180.    Defendants acted knowingly, willfully, recklessly or maliciously with the intent to injure Plaintiff and in conscious disregard of the injury which would be done to Plaintiff by such conduct such that an award of punitive and exemplary damages is warranted in an amount to be determined at trial.

WHEREFORE, EDC prays for relief as set forth below.


**TENTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

**(Against All Defendants)**

181.    Plaintiff realleges and incorporates by reference paragraphs 1 through 105 above as if fully set forth herein.

182.    Defendants at all times been aware that EDC has relationships with various third parties likely to lead to future economic benefit to EDC.  On information and belief, Defendants have intentionally disrupted those relationships by making false statements to such third parties, including the allegation that Pavlos was the only trained technician that EDC had employed and

1  that he no longer worked there but instead had joined GreenBox, and that Defendants provide a

2  superior product and superior service to EDC's.

3      183.   Defendants' statements to third parties were false and have disrupted EDC's

4  business relationships with third parties, thereby committing the tort of intentional interference

5  with prospective economic advantage.

6      184.   As a result of Defendants' wrongful acts as alleged above, EDC has sustained and

7  will continue to sustain, damages in an amount to be proven at trial.

8      185.   Defendants acted knowingly, willfully, recklessly or maliciously with the intent to

9  injure Plaintiff and in conscious disregard of the injury which would be done to Plaintiff by such

10  conduct such that an award of punitive and exemplary damages is warranted in an amount to be

11  determined at trial.

12      WHEREFORE, EDC prays for relief as set forth below.

13

14                  **ELEVENTH CAUSE OF ACTION**

15        **(Unfair Business Practices [Bus. & Prof. Code § 17200)**

16                  **(Against All Defendants)**

17      186.   Plaintiff EDC realleges and incorporates in this paragraph each of the allegations

18  in each of the other paragraphs of this Complaint.

19      187.   Upon information and belief:

20          a.   Defendants' gained unauthorized access to EDC's computers, computer

21  systems, and computer networks as described herein;

22          b.   Defendants obtained a copy of the Image File without EDC's permission;

23          c.   Seidel deleted emails on the EDC mail system and thereby deprived EDC

24  of their use;

25          d.   Seidel trafficked in a password to gain unauthorized access to EDC's

26  savegas.com server;

27          e.   Seidel and Pavlos violated the terms of their agreements with EDC;

28          f.   Seidel and Pavlos developed a business to compete with EDC while

employed by EDC; and

g.    Defendants made false statements to EDC's customers to solicit them and divert them from EDC.

188.    The conduct of Defendants as alleged herein constitutes unlawful, unfair or fraudulent acts or practices in the conduct or furnishing of a business, trade or service in California pursuant to California's Unfair Competition Law, Calif. Bus. & Prof. Code § 17200 ("UCL § 17200"), as well as the common law of the State of California.

189.    Such acts are "unlawful" within the meaning of UCL § 17200 because they rise to the level of being fraudulent, unfair, and deceptive and are in violation of law.

190.    Such acts are "unfair" within the meaning of UCL § 17200 because they offend public policy and are immoral, unethical, oppressive and unscrupulous; and this harm far out-weighs any utility of the conduct to Defendants.

191.    Plaintiff seeks to enjoin Defendants from continuing to engage in the above-described unethical, unlawful, fraudulent, unfair, and deceptive conduct.

192.    Plaintiff seeks the restitution and disgorgement of all amounts earned by Defendants as a result of the above-described unethical, unlawful, fraudulent, unfair and deceptive conduct.

WHEREFORE, EDC prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, EDC prays for judgement against all Defendants, and each of them, as follows:

a.    For an award of compensatory damages for Defendants' conduct according to proof at trial;

b.    For an order that Defendants account for and pay to Plaintiff all monies, profits, gains and/or savings derived from their illegal conduct;

c.    For punitive and exemplary damages against Defendants for all claims for relief for which such damages are authorized in an amount sufficient to punish them according to proof

---

1    at trial;

2    　　　　d.    For an order that Seidel Associates and Green Box Energy, their directors and

3    officers, agents, servants, employees, and all other persons acting in active concert or privately or

4    in participation with them, and each of them, be preliminary and permanently enjoined from:

5    　　　　　　　　(i)    accessing, using, copying, publishing, disclosing, attempting to use or

6    　　　　　　　　　　disclose, transferring, selling or otherwise distributing, directly or

7    　　　　　　　　　　indirectly, any of EDC's Proprietary Information, including its trade

8    　　　　　　　　　　secrets, related information, confidential and or/proprietary business

9    　　　　　　　　　　information, and any product developed with the use of, with reference to,

10    　　　　　　　　　　derived from, or incorporating all or any part of EDC's Proprietary

11    　　　　　　　　　　Information;

12    　　　　　　　　(ii)    gaining unauthorized access to or deleting EDC's computer networks,

13    　　　　　　　　　　computer systems, or data;

14    　　　　　　　　(iii)    transferring, sharing, or disclosing any user credentials (including without

15    　　　　　　　　　　limitation user names and passwords) facilitating access to EDC's

16    　　　　　　　　　　computer networks, computer systems, or data; and

17    　　　　　　　　(iv)    unfairly competing with EDC.

18    　　e.    For statutory damages of at least $1000 per violation of the Stored

19    　　　　Communications Act under 18 U.S.C. § 2707(c);

20    　　f.    For a disgorgement of any profits Defendants accrued as a result of their

21    　　　　violations of the Stored Communications Act under 18 U.S.C. § 2707(c);

22    　　g.    For exemplary damages and attorneys' fees under 18 U.S.C. § 2707(b), (c),

23    　　　　California Penal Code section 502(e)(2), and California Civil Code sections

24    　　　　3426.3 and 3426.4 according to proof;

25    　　h.    For interest and pre-judgment interest at the maximum legal rate;

26    　　i.    For costs of suit; and

27    　　j.    For such other and further relief as this Court deems just and proper.

28

Respectfully submitted,

Dated:  June 15, 2016                SILICON VALLEY LAW GROUP


By:   /s/ Michael W. Stebbins
      Michael W. Stebbins
      Stephen S. Wu
      Marc G. van Niekerk
      Attorneys for Plaintiff
      EDC TECHNOLOGIES, INC.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in the instant action.


Respectfully submitted,

Dated: June 15, 2016                    SILICON VALLEY LAW GROUP


By: ___/s/ Michael W. Stebbins_____
     Michael W. Stebbins
     Stephen S. Wu
     Marc G. van Niekerk
     Attorneys for Plaintiff
     EDC TECHNOLOGIES, INC.